MAUDE R. RICHARDSON *vs.* CITY OF NORTH ADAMS.

Berkshire.   September 18, 1956. — November 9, 1956.

Present: WILKINS, C.J., SPALDING, WILLIAMS, COUNIHAN, &
WHITTEMORE, JJ.

*Public Welfare. Old Age Assistance. Disability Assistance. Contract,*
What constitutes, Implied contract, With municipality. *Municipal
Corporations,* Contracts.

On the facts, there was no contract, express or implied, obligating a city
to pay a nursing home proprietor for care of recipients of old age and
disability assistance admitted to the home by arrangements made by
an employee of the city acting in the scope of his employment as their
next friend, either as to recipients admitted during a period when the
city sent the checks for assistance to the recipients as payees and the
proprietor collected his charges from them at a daily rate equivalent
to that allowed by the city's welfare department, or as to recipients
admitted during a later period when the city paid the proprietor di-
rectly for the care at the same rate; and, with respect to care furnished
to the recipients after the effective date of an increase made by the
proprietor in his daily rate, he could not recover from the city the
difference between his charges at the increased rate and payments
made to him by the city at the old rate, although the increased rate
was fair and reasonable.

CONTRACT.   Writ in the Superior Court dated September
27, 1954.

The action was heard by *Pecce, J.,* on an auditor's report.

*Bernhard Lenhoff,* for the plaintiff.

*Samuel E. Levine,* City Solicitor, for the defendant, sub-
mitted a brief.

WHITTEMORE, J.   The plaintiff, a nursing home operator
in North Adams, sued for an alleged balance due from the
defendant city for housing, care, and maintenance furnished
twenty persons who were recipients of old age and disability
assistance from the defendant.   Judgment was ordered for
the defendant in the Superior Court in accordance with the
report of an auditor whose findings of fact were final.   This
is the plaintiff's appeal from the order for judgment.   There
was no error.

The plaintiff raised her daily rates from $5 to $6 on August 1, 1954. The defendant, although notified, continued to send checks to the plaintiff for the accounts of the aid recipients at the rate of $5 per day or $35 a week. The auditor found that $6 a day was a fair and reasonable charge for what was furnished by the plaintiff. However, he also found that there was no contract between the plaintiff and the defendant and he found subsidiary facts which negative the plaintiff's contention that a contract is to be implied.

General Laws (Ter. Ed.) c. 118A, § 1, as amended, provides in part that "Such [statutory old age] assistance shall, wherever practicable, be given to the aged person in his own home or in lodgings or in a boarding home, which for the purposes hereof shall include any institution providing shelter, care and treatment for aged persons which is not supported in whole or in part by public funds . . . [and it] shall be paid by check or in cash, which shall be delivered to the applicant at his residence, if he so requests, and shall be paid semi-monthly in advance unless the applicant prefers less frequent payments. . . . Payment for medical, hospital, visiting nurse service, convalescent and nursing home, or funeral expenses of any such aged person may be paid directly to the person . . . furnishing such services. Payment for other services rendered to such an aged person may be paid directly to the person furnishing such services only when such payment is effected to meet an expense which remained unpaid at the time of the death of such aged person or his commitment to an institution as an insane person or in a case where such payment is necessary to discharge an obligation incurred by the board of public welfare in securing such services for such aged person."

This statute sets up a plan for payments to the aid recipients or for their account in stated cases. While it does not expressly authorize the municipality to contract for any services, its terms assume that it may do so at least in some cases.

The facts found by the auditor include those hereinafter

stated. Each of the subject aid recipients entered the plaintiff's home pursuant to a telephone call from an employee of the defendant acting within the scope of her employment and inquiring if the plaintiff had a bed available. There was not in these calls or any other talks any reference to the plaintiff's rates or charges. Until February 1, 1954, the defendant sent each check for aid to the recipient as payee, and the plaintiff had the latter indorse the check and then cashed it and deducted a sum equal to $35 a week from the proceeds. She gave the balance, if any, in each case to the aid recipient. On February 1, 1954, the defendant, pursuant to the permissive provision of the statute quoted above, began sending checks directly to the plaintiff at the rate of $35 per week, less the amount of the recipient's social security or insurance benefits if any.

Two of the subject aid recipients were placed in the plaintiff's home after February 1, 1954. The auditor found that when the arrangements were made for the admission of these persons both parties intended that their relative rights and obligations, if any, with respect thereto should be the same as in the cases of the eighteen aid recipients who had been admitted to the plaintiff's home prior to February 1, 1954.

The auditor found, as to the admissions prior to February 1, 1954, that both parties intended that no direct payment should be made to the plaintiff, that the defendant would pay to each aid recipient the amount of assistance to which he was entitled by law, and that the plaintiff would look to each such person for payment. He found also that in respect of the change of practice which began February 1, 1954, neither party intended that a contract should be made obligating the defendant to the plaintiff or that there should be any change in respect of existence or absence of contractual obligations in the relationship as it theretofore existed.

When the plaintiff on July 12, 1954, notified the defendant of the increase in rates, the defendant's welfare department by letter of July 22, 1954, answered that the department was

not empowered to authorize nursing home care at rates in excess of $35 per week except for cases requiring exceptional medical and nursing services and that "recipients who are currently in nursing homes, will receive from this department written authorization for such nursing home care at rates not to exceed $35 per week, which care they may then secure at nursing homes of their own choice." On July 23, 1954, the plaintiff by letter reaffirmed the new rate and gave notice that the defendant "must take immediate steps to make other arrangements for the housing and care of individuals under your supervision" and that permitting the patients to remain would "bind you to the new rates."

The defendant did not take any action to cause the removal of any of the aid recipients. The plaintiff did not discuss the increase with any of the aid recipients or ask for it in any case, or request any of the aid recipients to leave. She took no legal action of any kind against any recipient to cause departure or to collect the additional $1 per day.

The auditor found that "All of the [subject] persons . . . are free to live wherever they wish, and to receive nursing home care wherever they wish. They are not subject to any control by the defendant in deciding where they live or receive such nursing home care. All of them are free and at liberty to leave or move out of the plaintiff's nursing home whenever they wish, without requiring any permission, approval or clearance on the part of the defendant, except that if they leave the Commonwealth, they are required by G. L. c. 118A, § 6A, to notify the defendant of departure and return. All of this has been true during the entire period of time these persons have been receiving either old age assistance or disability assistance from the defendant." So far as this is a ruling of law it is correct. It is not controlled by or inconsistent with the finding that the reason the defendant participated in the admission of aid recipients to the plaintiff's home was that they were physically incapable of making their own arrangements and had no relatives or friends offering to do so. Participation as agent or next friend of the aid recipient did not make the defendant city liable as

principal. The provisions of the statute do not require the conclusion that the defendant was itself purporting to contract to pay for the care furnished, assuming it had the power to do so.

The contention that the defendant is liable on an implied contract because, under other statutes, it was obliged to provide the care which at its request the plaintiff furnished is answered by the auditor's finding as follows: "The amount of assistance which the defendant furnished to each such person, taken together with the additional social security or insurance benefits received by six of such persons, was reasonable, adequate and sufficient in each such case to prevent such person from being 'poor and indigent' as such words are used in G. L. (Ter. Ed.) c. 117, § 1; or from being 'in distress and standing in need of immediate relief' as such words are used in § 14 of said chapter; or from being 'a person in need of public assistance' as such words are used in § 24 of said chapter. As to each such person, such assistance included or allowed for $35 per week for such person's nursing home care." So far as this is a ruling of law the subsidiary facts found do not make it erroneous. It is not made so by the finding that a fair and reasonable charge for the particular care which the plaintiff furnished was $6 per day.

We do not reach the question of the defendant's power to contract expressly for the aid and care furnished.

We do not consider the objections to the report as there was no motion to recommit. *Gordon* v. *Medford*, 331 Mass. 119, 124. No error appears in the reported rulings of the auditor excluding evidence.

*Order for judgment affirmed.*